[No. F021307. Fifth Dist. Nov. 8, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSE RANGEL RODRIGUEZ, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II-IV.

## COUNSEL

Carlo Andreani, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, J. Robert Jibson and Karen L. Ziskind, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WISEMAN, J.**—In this murder case, the trial court falls into the ever too common sinkhole of *Wheeler* error committed while selecting alternate jurors during the last gasp of more than one month of voir dire proceedings. Under almost any conceivable set of circumstances, unless remedied by a dismissal of the entire jury panel, this slip would be legally unforgiveable resulting in per se reversible error. Based on the singular scenario of this case, we conclude the court's error is a "trial error" thereby subjecting its effect to a harmless error analysis to be applied by the trial court. Whether the conviction is reinstated or a new trial granted depends upon the outcome of a hearing on remand to determine whether the prosecutor had racially neutral reasons for excusing two Hispanic jurors timely challenged by the defense counsel.

### PROCEDURAL HISTORY

Following a preliminary hearing, Jose Rangel Rodriguez (defendant) was charged by information filed December 13, 1989, in the Tulare County

Superior Court with four felony counts: murder (Pen. Code,[1] § 187, subd. (a)), robbery (§ 211), forcible rape (former § 261, subd. (2)), and burglary (§ 459). With respect to the murder count, the information alleged three special circumstances under section 190.2, subdivision (a)(17), each alleging the murder was committed during the commission or attempted commission of the felonies alleged in the other three counts.

On December 14, 1989, defendant appeared for arraignment. Deputy Public Defender Smukler, having represented defendant at his preliminary hearing, was reappointed to represent defendant in superior court. Defendant entered a plea of not guilty on all counts and denied all special circumstance allegations.

On August 6, 1990, defendant filed an in propria persona motion to either substitute private counsel for the public defender's office or to have a "death penalty experienced counsel Spanish speaking" appointed. This was the first of a series of similar motions. All such motions were ultimately denied, and the public defender's office continued to represent defendant through trial.

On November 16, 1990, defendant moved to suppress statements and physical evidence on the grounds the evidence was "the tainted product of unlawful detentions occurring on May 8, 1989, and May 9, 1989, and onward; of warrantless and unlawful searches and seizures occurring on May 8, 1989, and May 9, 1989; of involuntary statements; and of unlawful arrests." This motion was the subject of a five-day hearing, after which Judge Robert C. Van Auken "reluctantly" ruled the motion was meritorious, and ordered certain evidence suppressed. The prosecution sought mandamus relief from this court, and on December 17, 1991, this court granted partial relief, finding some of defendant's statements were admissible, and remanding for a determination whether the deputies who arrested defendant had probable cause to do so. A subsequent hearing before Judge Edward Kim yielded a ruling that the officers did have probable cause to arrest, and thus certain postarrest evidence was admissible. Judge Kim found a later *Miranda*[2] violation necessitated suppression of some statements and physical evidence. Defendant in turn sought mandamus relief from this court, asserting the trial court had failed to follow our directions. We summarily denied relief on April 9, 1992.

At some point, defendant moved to suppress his confession as involuntary. The motion was heard by Judge Kim on November 8, 1993, and denied.

---

[1]All statutory references are to the Penal Code unless otherwise indicated.

[2]*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

Jury selection began December 1, 1993, before Judge Kim. On January 10, 1994, a 12-member jury was sworn, and selection of alternates began. The prosecutor exercised a peremptory challenge to excuse one of the potential alternates, and defendant made an immediate *Wheeler/Batson* motion (*People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748]; *Batson* v. *Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712]) concerning the prosecution's exercise of peremptory challenges against both members of the jury and alternates. The court denied the motion regarding selection of the 12-member panel as untimely, but found it both timely and meritorious with respect to the 1 potential alternate excused. The court refused to dismiss the entire panel and quash the venire, as defendant requested. Instead, it directed the excused panelist be seated if she was still available. The panelist had apparently left, however, and three alternates were selected and sworn from the remaining venire.

Following a lengthy trial, defendant was found guilty on all counts, and the special circumstance allegations were found to be true. At the end of the penalty phase, the jury fixed the sentence on count 1 at life without possibility of parole.

Defendant was sentenced on March 3, 1994. The court imposed life without possibility of parole on count 1, and stayed midterm sentences of four, six and four years, respectively, on the remaining counts, pursuant to section 654.

A timely notice of appeal was filed.

### Factual History

In April 1989, defendant performed yard work for the victim, 62-year-old Josefina Aquino. Before completing the job, defendant requested an additional $20 in payment. Defendant was told no. He did not argue, but completed the work and was paid the agreed upon amount, $100. At a later date, defendant received an additional $20 from the victim to cover charges for dumping the trash.

During the early morning hours of Sunday, May 7, 1989, defendant broke into the victim's mobilehome. A neighbor was awakened and heard the words, "money, money, money." The neighbor saw a big shadow resembling a man pushing a woman around. The man was shirtless with straight hair.

Later that morning, Aquino's body was found lying beneath a mattress with her hands tied behind her. A sheet was wrapped several times around

her face and there was an apparent bloodstain around her mouth. The northeast living room window screen was freshly cut by a sharp object but the glass window was intact.

An autopsy of Aquino revealed she was four feet eleven and one-half inches tall, weighed eighty-five pounds, and had suffered multiple trauma to her face, neck, and shoulders, resulting in abrasions, lacerations, and fractured ribs. The cause of death was suffocation from clothing which had been wrapped tightly around her face and neck, preventing her from breathing, and causing death in about three or four minutes. Aquino also suffered a jagged "hemorrhage" to the outside of her vagina while still alive. Expert testimony indicated a hair removed from the bed sheet was consistent with defendant's pubic hair.

Later on that same day, about 1:30 p.m., defendant told Francisco Sartiaguin that he had beaten or struck a man. Afterwards, he said it was an older man, then said it was an older woman. Defendant told Sartiaguin he had gone to the woman's mobilehome, where he tore out the telephone cord and beat her up to frighten her, then tied her up and took about $200. Although defendant had no money the night before, on Sunday he was able to show Sartiaguin about $200: a $100 bill and some $20 bills. On Monday defendant was upset, telling Sartiaguin the older woman was dead.

On May 9, 1989, defendant was interviewed by Detective Morales and Sergeant Salazar. More than $100 was seized from his person upon his arrest. During the interview, defendant related many of the details of the crime. Defendant indicated he had been drunk and under the influence of marijuana when he went to Aquino's home. He said he went there to collect $20 and she bit him. He struck her in the face several times, struggled with her, and held her in a bear hug while he guided her around the mobilehome looking for money. When she finally told him that approximately $120 was near a chair or sofa in the living room, he tied her hands and covered her face with a sheet. He adamantly denied he had intercourse with her or that she was dead when he left the residence.

DISCUSSION

I. *The Wheeler/Batson Motion*

On January 10, 1994, 12 jurors were sworn to decide the instant case. During the process of selecting those jurors, Prosecutor Richard June exercised peremptory challenges as to two Hispanics, Amelia R. and Donna S. After the jury was sworn, the court went on to select three alternates. Two

prospective alternates were called to the box, Dawnell H. and Ermelinda L. (Ms. L.) The prosecutor immediately exercised a peremptory challenge against Ms. L., and defense counsel Ben Smukler (Smukler) promptly asked for a motion to be heard outside the presence of the jury. The jury was excused, and Smukler expressed his desire to bring a *Wheeler/Batson* motion (*People* v. *Wheeler, supra,* 22 Cal.3d 258; *Batson* v. *Kentucky, supra,* 476 U.S. 79). The following exchange then took place:

"THE COURT: You have reference now only to the alternate juror, I take it?

"MR. SMUKLER: No, I'm making reference to the fact—

"THE COURT: Your motion will be denied with respect to the other jurors. That has not been made timely.

"MR. SMUKLER: Well, I think it has. I'd like to argue it anyway.

"THE COURT: If you have an objection to the alternate juror, I'll listen to that.

"MR. SMUKLER: Okay. Then I'll argue it that way. First of all, the other basis, of course, is Batson versus Kentucky, 476 U.S. 79. My motion is based on the fact that counsel has now exercised his third challenge against a Hispanic juror. I realize the Court wants me to limit it to [Ms. L.], but I would at least reference the fact that this is his third challenge. By my count, under the original panel of 62 prospective jurors that were called today, there were nine Hispanic prospective jurors. Counsel has used a total of 18 challenges. Of those 18 challenges, including the one as to [Ms. L.], three of those have been for Hispanic jurors.

". . . . . . . . . . . . . . . . . . . . . . . .

"THE COURT: At any rate, I'm going to tell you right now that I am only going to consider any motion you might make with respect to this alternate juror.

". . . . . . . . . . . . . . . . . . . . . . . .

"MR. SMUKLER: . . . With regard to [Ms. L.], I would argue that if the Court looks at the transcript, which we are trying to find right now of the questionnaire, there was nothing different about her apart from other individuals, as far as what she put down on the questionnaire, or in terms of what—Mr. June questioned her during the voir dire process—

"THE COURT: Again, I want to hear an argument only about [Ms. L.].

"MR. SMUKLER: I am arguing about her. I'm talking only about her.

"THE COURT: Talk about [Ms. L.] only.

"MR. SMUKLER: I am. That's the only one I'm talking about.

"THE COURT: I don't hear her name mentioned. I hear you talking about other people.

"MR. SMUKLER: No, I said if you look at her questionnaire, [Ms. L.'s] questionnaire, and if you look at the transcript of the voir dire of her by the prosecutor, as well as by us, you will see that there is nothing that stands out about her other than the fact that she's Hispanic. . . ."

The judge eventually called on the prosecutor to "explain [his] reason for excusing [Ms. L.]." His reasons amounted to little more than a "funny feeling" about the prospective alternate juror, and the perception that her "background . . . seemed to me to be somewhat unsophisticated . . . ." The judge quickly ruled:

"THE COURT: . . . I'm going to disallow your peremptory challenge of [Ms. L.].

"MR. SMUKLER: Your Honor, in the event that [Ms. L.] has left, we would move to strike the entire panel. I realize the Court's limited our argument to the alternate.

"THE COURT: That motion is denied as having no basis and merit. You may call the jury back in. I don't want to hear any more about that.

"MR. JUNE: Are we going to bring her back?

"THE COURT: Well, if she's gone, she's gone. We'll get somebody else. You will be deemed to have exercised one challenge."

Ms. L. was in fact gone.[3] Three other alternates were promptly sworn. No alternate was ever called upon to replace any member of the jury. Thus, this case was decided by the original 12 jurors. Defendant's complaint is two-fold: (1) He charges the trial court erred in finding his *Wheeler/Batson*

---

[3]This was no doubt due to the fact the court told the prospective jurors they were "free to leave" and return home, if excused.

motion was untimely with respect to prospective jurors Amelia R. and Donna S.; and (2) after rejecting the prosecutor's peremptory challenge to Ms. L., the court committed reversible error per se by failing to dismiss the entire panel and starting over with jury selection. We address each of these complaints, in turn.

(1) *Defendant's Wheeler/Batson motion was timely with respect to all three Hispanic jurors.*

■ The Attorney General properly concedes the trial court erred in ruling the *Wheeler/Batson* motion untimely as to prospective jurors Amelia R. and Donna S., based on this court's decision in *People* v. *Gore* (1993) 18 Cal.App.4th 692 [22 Cal.Rptr.2d 435].

The facts in *Gore* are remarkably similar to defendant's case. In *Gore*, the prosecutor exercised peremptory challenges to exclude four Hispanics from the jury in a capital murder case. The defense raised no objection. A panel of 12 jurors was sworn. While selecting the alternate jurors, the prosecutor excused three more Hispanics. Only then did defense counsel make a *Wheeler* motion which extended to all seven Hispanic jurors excused, including the four jurors excused before the jury was sworn. (*People* v. *Gore, supra,* 18 Cal.App.4th at p. 697.) The trial court ruled the motion was untimely with respect to the four Hispanic jurors excused before the jury was sworn. (*Id.* at pp. 697-698.) It determined the motion was timely with respect to the three Hispanic jurors excused during selection of the alternates. The court found the defendant had established a prima facie case of systematic exclusion of Hispanic jurors. Accordingly, it had the prosecutor explain his reasons for excusing the three Hispanic jurors challenged after the jury was sworn. Having heard the explanations, the court determined the reasons the three Hispanic jurors were excused had " 'nothing to do with the ethnic background of the person.' " (*Id.* at p. 699.)

This court held in *Gore*: ". . . [T]o be timely a *Wheeler* objection or motion must be made, at the latest, before jury selection is completed. 'The general rule is that where a court has indicated that a trial will be conducted with alternate jurors, the impanelment of the jury is not deemed complete until the alternates are selected and sworn.' (*In re Mendes* (1979) 23 Cal.3d 847, 853 [153 Cal.Rptr. 831, 592 P.2d 318].)" (18 Cal.App.4th at p. 703.)

Here, there is no question the trial court erred when it ruled defendant's *Wheeler/Batson* motion was untimely with respect to the two prospective jurors challenged prior to when the jury was sworn. The thorny issue then becomes what is the appropriate remedy.

Pursuant to *Gore*, the Attorney General contends the appropriate remedy is a limited remand for the trial court to rule on the merits of the motion. In *Gore*, this court acknowledged *Wheeler* error had always been considered reversible per se. (*People v. Gore, supra*, 18 Cal.App.4th at p. 705, citing *People v. Snow* (1987) 44 Cal.3d 216, 226 [242 Cal.Rptr. 477, 746 P.2d 452].) However, we went on to hold the facts in *Gore* did not require a complete reversal of the conviction. Instead, we determined the appropriate remedy was to remand so the trial court could "reexamine the validity of the prosecutor's reasons for challenging the three Hispanic jurors in the light of the prosecutor's reasons for challenging the four Hispanic jurors on the regular panel." (*People v. Gore, supra*, 18 Cal.App.4th at p. 706.) The court was directed to examine " 'the totality of the relevant facts and . . . consider all the relevant circumstances.' *Batson v. Kentucky, supra*, 476 U.S. at pp. 96-97 [90 L.Ed.2d at pp. 87-88].)" (18 Cal.App.4th at p. 706.)

We found authority for this action in the comments of the California Supreme Court in *People v. Snow*: "The People suggest, however, that we merely order a 'limited remand' to permit the prosecutor to explain his reasons for excluding the prospective jurors in question. We observe that, although our court has rejected such a procedure in prior cases [citations], the United States Supreme Court in the subsequently decided case of *Batson v. Kentucky, supra*, 476 U.S. at page 100 [90 L.Ed.2d at page 90] employed such a remand. (See also *United States v. Tindle* (4th Cir. 1986) 808 F.2d 319 [remand after more than three years].)

"In *Batson*, the case had been tried only two years prior to reversal of the judgment. In the present case, voir dire examination commenced in November 1981, approximately six years ago. As in *Hall*, we believe it would be 'unrealistic to believe that the prosecutor could now recall in greater detail his reasons for the exercise of the peremptory challenges in issue, or that the trial judge could assess those reasons, as required, which would demand that he recall the circumstances of the case, and the manner in which the prosecutor examined the venire and exercised his other challenges.' (35 Cal.3d at p. 171.)" (*People v. Snow, supra*, 44 Cal.3d at pp. 226-227.)

Although the California Supreme Court declined to order a limited remand in *Snow*, this court noted the above quoted language indicated a remand could be ordered in the appropriate case. (*People v. Gore, supra*, 18 Cal.App.4th at p. 706.) We found *Gore* to be such a case. Voir dire had occurred only about a year prior to the date of the decision. Since it was a death penalty case, it was likely both the counsel and the court paid close attention and were more likely to recall the specifics of the voir dire. Finally, voir dire was detailed and included a 15-page questionnaire. (*Ibid.*)

Later, this court followed *Gore* in *People* v. *Tapia,* and again ordered a limited remand when the trial court failed to properly address a *Wheeler* motion. (*People* v. *Tapia* (1994) 25 Cal.App.4th 984, 1031 [30 Cal.Rptr.2d 851].) We noted upon remand, the court and counsel would have available the transcript of the voir dire and the written answers to juror questionnaires. We concluded: "We have confidence that after a careful reading of the record and this opinion, the trial court will be able to fulfill its constitutional obligation under *Wheeler, supra.*" (*Id.* at pp. 1031-1032.)

The rationale this court used to order a limited remand in *Gore* and *Tapia* applies equally to defendant. He too was charged and tried for first degree murder with special circumstances. Consequently, it is likely counsel and the court paid close attention to the voir dire questions and the jurors' responses. There is an extensive eight-page questionnaire completed by the jurors as well as an extensive transcript of voir dire that could be reviewed upon remand. Although the time lapse between the voir dire and the decision of this court will be longer than occurred in *Gore,* it is not as long as the time lapse in *Tapia.* We see no reason why the trial court in defendant's case would be any less able to fulfill its constitutional obligation than was the court in *Tapia* or *Gore.*

(2) *It was error for the trial court to fail to excuse the entire panel and start jury selection anew.*

As previously mentioned, *Gore, Tapia,* and defendant's case all deal with a situation where the trial court failed to consider the peremptory challenges made by the prosecutor prior to the jury being sworn as part of defendant's *Wheeler/Batson* motion. The defendant's case differs from the *Gore* and *Tapia* cases, because in the defendant's case the court agreed with defense counsel and *disallowed* the prosecutor's challenge of Ms. L. Thus, unlike *Gore* and *Tapia,* we are faced with a secondary issue of determining whether under the facts of this case, this action required the court to quash the entire panel, and start jury selection anew.

■ Defendant is correct when he states the only option previously recognized for a violation of *Wheeler* in California is to begin jury selection anew. (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 282; *People* v. *Tapia, supra,* 25 Cal.App.4th at p. 1013.) "If the court finds that the burden of justification is not sustained as to any of the questioned peremptory challenges, the presumption of their validity is rebutted. Accordingly, the court must then conclude that the jury as constituted fails to comply with the representative cross-section requirement, and it must dismiss the jurors thus far selected. So too it must quash any remaining venire, since the complaining party is

entitled to a random draw from an entire venire—not one that has been partially or totally stripped of members of a cognizable group by the improper use of peremptory challenges. Upon such dismissal a different venire shall be drawn and the jury selection process may begin anew." (22 Cal.3d at p. 282, fn. omitted.)

In a footnote, the Supreme Court observed: "Additional sanctions are proposed in the literature . . . , but we have no present grounds to believe that the above procedure will be ineffective to deter such abuses of the peremptory challenge. If experience should prove otherwise, it will be time enough then to consider alternative penalties." (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 282, fn. 29.)

The Attorney General argues strenuously the "remedy of dismissing the panel and quashing the venire is an extreme remedy which is costly, time consuming, and does not serve the ends of justice." The People claim the most effective way to protect against the discriminatory use of peremptory challenges is to do what the trial court did: deny the challenge, seat the juror and declare one of the prosecutor's challenges forfeited. All this is true. Unfortunately, this argument is contrary to the holding of the California Supreme Court and virtually all the District Courts of Appeal that have addressed the issue. We are therefore compelled to conclude the trial court erred when it did not strike the entire venire following its denial of the prosecution's peremptory challenge of the alternate juror.

(3) *Based on the unique facts of this case, a harmless error analysis applies.*

Although we find the trial court erred, this does not conclude our analysis because of a significant fact present in the instant case that is absent in most: *no alternate juror was ever substituted in to sit as a juror in defendant's case.* Here, following the prosecutor's challenge to Ms. L., she left the courtroom, and another alternate juror was seated in her place. Following its disallowance of the prosecutor's challenge to Ms. L., the trial court obviously intended to remedy the situation by having Ms. L. remain as a prospective alternate. The prosecutor was "docked" by having his improper challenge to Ms. L. count as a peremptory challenge, and since presumably defense counsel would not excuse Ms. L., she would eventually be seated as an alternate. As we have previously stated, such a remedy was improper. In any event, this remedy was never implemented because Ms. L. apparently left the courtroom while the court and counsel were discussing the *Wheeler/ Batson* motion.

Recognizing that no alternate juror was ever seated as a juror in this case, the issue for this court is whether a harmless error analysis should be

applied, and, if so, was any error harmless beyond a reasonable doubt. Or, applying the test required by the California Supreme Court, can this court determine whether it is " 'reasonably probable that a result more favorable to the [defendant] would have been reached in the absence of the error.' " (*People* v. *Cahill* (1993) 5 Cal.4th 478, 492 [20 Cal.Rptr.2d 582, 853 P.2d 1037], citing *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

Defendant argues the error is reversible per se, citing *Wheeler* and *Smith*, *supra*, as well as *People* v. *Gonzalez* (1989) 211 Cal.App.3d 1186 [259 Cal.Rptr. 870], and *People* v. *Granillo* (1987) 197 Cal.App.3d 110 [242 Cal.Rptr. 639].

*Wheeler* did indeed state: " 'The right to a fair and impartial jury is one of the most sacred and important of the guaranties of the constitution. Where it has been infringed, no inquiry as to the sufficiency of the evidence to show guilt is indulged and a conviction by a jury so selected must be set aside.' [Citations.]" (*People* v. *Wheeler*, *supra*, 22 Cal.3d at p. 283.) But, the inquiry cannot end there. ■ Whether an error, even one of constitutional dimensions, is considered reversible per se or one to which harmless error may be applied is dependent upon whether the error is a "structural defect" which affects the entire proceeding, or a "trial error." (*People* v. *Cahill*, *supra*, 5 Cal.4th at p. 487; *Arizona* v. *Fulminante* (1991) 499 U.S. 279, 309-310 [113 L.Ed.2d 302, 331-332, 111 S.Ct. 1246]; *Satterwhite* v. *Texas* (1988) 486 U.S. 249, 256 [100 L.Ed.2d 284, 293-294, 108 S.Ct. 1792].) Although the distinction is easy to state in the abstract, application of it to any given error is not quite as simple.[4]

(a) *Historical analysis of "structural defects" versus "trial defects" with respect to the applicability of a harmless error analysis.*

Errors of constitutional magnitude the United States Supreme Court has found to be "structural defects" include: total deprivation of counsel throughout an entire proceeding (*Gideon* v. *Wainwright* (1963) 372 U.S. 335 [9 L.Ed.2d 799, 83 S.Ct. 792, 93 A.L.R.2d 733]); conflict of interest in representation throughout the entire proceeding (*Holloway* v. *Arkansas*

[4]"Errors are the insects in the world of law, travelling through it in swarms, often unnoticed in their endless procession. Many are plainly harmless; some appear ominously harmful. Some, for all the benign appearance of their spindly traces, mark the way for a plague of followers that deplete trials of fairness.

"The well-being of the law encompasses a tolerance for harmless errors adrift in an imperfect world. Its well-being must also encompass the capacity to ward off the destroyers. So an inquiry into what makes an error harmless, though one of philosophical tenor, is also an intensely practical inquiry into the health and sanitation of the law." (Traynor, The Riddle of Harmless Error (1970) Foreword.)

(1978) 435 U.S. 475 [55 L.Ed.2d 426, 98 S.Ct. 1173]); denial of a defendant's right to a public trial (*Waller* v. *Georgia* (1984) 467 U.S. 39 [81 L.Ed.2d 31, 104 S.Ct. 2210]); adjudication by a biased judge (*Tumey* v. *Ohio* (1927) 273 U.S. 510 [71 L.Ed. 749, 47 S.Ct. 437, 50 A.L.R. 1243]); and unlawful exclusion of members of the defendant's race from a grand jury (*Vasquez* v. *Hillery* (1986) 474 U.S. 254 [88 L.Ed.2d 598, 106 S.Ct. 617]).

On the other hand, the spectrum of constitutional errors to which a harmless error analysis has been applied is broad, including violations of the Fourth, Fifth and Sixth Amendments. (See *Arizona* v. *Fulminante, supra,* 499 U.S. 279.)[5] Even a defendant's right to effective assistance of counsel at all stages of a criminal proceeding is subject to a harmless error analysis. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." (*Strickland* v. *Washington* (1984) 466 U.S. 668, 691 [80 L.Ed.2d 674, 696, 104 S.Ct. 2052].)

The United States Supreme Court has specifically applied a harmless error analysis to a trial court's erroneous failure to excuse a juror for cause. (*Ross* v. *Oklahoma* (1988) 487 U.S. 81 [101 L.Ed.2d 80, 108 S.Ct. 2273].) Noting that after his challenge for cause was denied, the defendant used his peremptory challenge against the juror, the court in *Ross* held the defendant could not show he was harmed. "Any claim that the jury was not impartial, therefore, must focus not on [the juror who was excused], but on the jurors who ultimately sat. None of those 12 jurors, however, was challenged for cause by petitioner, and he has never suggested that any of the 12 was not impartial." (*Id.* at p. 86 [101 L.Ed.2d at p. 88].)

Recently, the United States Supreme Court moved toward finding more constitutional errors fall within the definition of "trial errors" to which harmless error is applied. (See *Arizona* v. *Fulminante, supra,* 499 U.S. at p. 306 [113 L.Ed.2d at p. 329] ["most constitutional errors can be harmless"]; *People* v. *Cahill, supra,* 5 Cal.4th at p. 486 ["Prior to *Fulminante,* a series of decisions by that court—stretching over at least 25 years—had indicated that, under federal constitutional principles, the admission of a coerced confession in a state criminal trial never could be considered harmless error"]; *Brecht* v. *Abrahamson* (1993) 507 U.S. 619, 630-639 [123 L.Ed.2d 353, 367-374, 113 S.Ct. 1710, 1718-1722] [harmless error applied to collateral review of constitutional error in state court criminal trials].)

It is against this backdrop that we decide: (1) whether the trial court's failure to dismiss the entire jury panel following its disallowance of the

---

[5]See Edwards, *To Err Is Human, But Not Always Harmless: When Should Legal Error Be Tolerated?* (1995) 70 N.Y.U. L. Rev. 1167, 1176-1177, for a more complete discussion of types of constitutional errors to which harmless error has been applied.

prosecutor's challenge to Ms. L. was a "trial error" or a "structural defect;" and (2) assuming the error was a "trial error," was it harmless.

There is no California case which has specifically addressed the issue before this court. There are, however, federal cases which are helpful in resolving this issue. The Ninth Circuit Court of Appeals addressed the issue of the erroneous rulings on peremptory challenges in *Nevius* v. *Sumner* (9th Cir. 1988) 852 F.2d 463, certiorari denied 490 U.S. 1059 [104 L.Ed.2d 441, 109 S.Ct. 1972] (1989), a case very similar to that of defendant. Nevius was charged with first degree murder. On appeal, he claimed the prosecution had improperly exercised its peremptory challenges to exclude Black and Hispanic venirepersons from his jury. (852 F.2d at p. 466.) The court noted the protection of *Batson* was unavailable to defendant since his conviction was final prior to the date of the *Batson* decision. Nevertheless, the court analyzed his claim on equal protection grounds. (*Id.* at p. 467.) The court went on to find the prosecutor had provided a legitimate basis for challenging all but one of the jurors. The court noted, however, this juror was an alternate and no alternate was ever called upon to serve. The court stated, therefore, "the challenge was harmless." (*Id.* at p. 468.)

In contrast to *Nevius, supra,* in two other cases, the Ninth Circuit refused to apply a harmless error analysis to a trial court's improper ruling on a peremptory challenge. (*Medrano* v. *City of Los Angeles* (9th Cir. 1992) 973 F.2d 1499; *U.S.* v. *Thompson* (9th Cir. 1987) 827 F.2d 1254.) However, those cases are factually distinguishable from *Nevius* and appellant's case. In *Medrano*, the peremptory challenge was to an alternate who ultimately replaced someone on the jury. "An erroneous denial of a peremptory challenge with respect to a person *who becomes a member of the jury* results in an automatic reversal." (*Medrano* v. *City of Los Angeles, supra,* 973 F. 2d at p. 1503, italics added.) In *Thompson*, the court held it was error to not allow the defendant or his trial counsel to hear or be present when the prosecutor presented his reasons for challenging Black jurors. (*U.S.* v. *Thompson, supra,* 827 F.2d at p. 1261.) In other words, unlike defendant, Thompson was deprived of his right to counsel and to be present during a critical portion of his trial—situations which the United States Supreme Court has found to constitute "structural errors."

Recently, the Ninth Circuit, in *U.S.* v. *Annigoni* (9th Cir. 1996) 96 F.3d 1132, revisited the issue of whether harmless error should be applied when a trial court incorrectly denies a defendant's peremptory challenge. In *Annigoni*, the trial court denied the defendant's peremptory challenge of a juror based on its finding the challenge was racially motivated. The challenged juror was ultimately seated as a member of the jury which convicted

Annigoni. (*Id.* at pp. 1134-1136.) The ruling was found to be error and the appellate court then considered whether a harmless error analysis should be applied. The court noted the traditional remedy when a criminal defendant has improperly been denied the right to exercise a peremptory challenge is automatic reversal without any necessity to show prejudice. (*Id.* at pp. 1142-1143.) It then found that nothing in recent United States Supreme Court decisions, including *Batson* v. *Kentucky*, *supra*, justified a departure from that rule. (*Id.* at pp. 1142-1146.)

This decision, by its very nature, is inapplicable to defendant's case. The peremptory challenge exercised in this case was by the prosecutor, not the defendant. In *Annigoni,* the defendant provided a racially neutral reason for excusing the juror in question. Even so, the trial court disallowed his challenge, had the juror remain on the jury, and counted the disallowed peremptory challenge as one against the defendant. The net result of the trial court's ruling was to mandate the challenged juror serve on the jury since it was highly unlikely the prosecutor would have excused the juror. Hence, defendant was denied his right to exercise a peremptory challenge, and the denial arguably had a direct result on the trial's outcome, since the challenged juror was a member of the jury which ultimately convicted the defendant. In the instant case it was the prosecutor whose peremptory challenge was correctly disallowed by the trial court. Thus we are not faced with a situation where a defendant was denied his right to exercise a peremptory challenge. An even more important distinction is, unlike *Annigoni*, *supra*, here the trial court's error could not possibly have affected the outcome of the trial since the challenged juror was an alternate and no alternate was ever seated.

Relying on the United States Supreme Court's decision in *Vasquez* v. *Hillery*, *supra*, the Eighth Circuit Court of Appeals found that a prosecutor's race-based peremptory challenges of jurors and alternates was a "structural defect" not subject to harmless error analysis (*Ford* v. *Norris* (8th Cir. 1995) 67 F.3d 162, 171). In reaching this decision, the court found no meaningful distinction between discrimination in selection of a grand jury and selection of a petit jury. (*Id.* at p. 170.)

It is true a plurality of the United States Supreme Court did hold in *Vasquez* v. *Hillery* that discrimination in the selection of a grand jury was a structural defect not subject to harmless error analysis. (*Vasquez* v. *Hillery*, *supra*, 474 U.S. at pp. 263-264 [88 L.Ed.2d at pp. 608-610].) But, this decision is not dispositive of the specific issue before this court. *Vasquez* involved racial discrimination in the procedure used to select the grand jury which actually indicted the defendant. (*Id.* at pp. 255-256 [88 L.Ed.2d at p.

604].) The court did not address a situation (like defendant's) where individuals who, although they were improperly excluded for racially motivated reasons, would not have served on the grand jury which indicted the complaining defendant in any case.

Moreover, the reference in *Vasquez* to the fact that reversal has been mandated when error is found in the selection of a petit jury, is dicta and does not foreclose the application of harmless error to defendant's case. In contrast to the instant case, both cases cited by the court in *Vasquez* involved errors which were pervasive and affected the jury members that actually decided the defendant's case. (See *Davis* v. *Georgia* (1976) 429 U.S. 122 [50 L.Ed.2d 339, 97 S.Ct. 399] *(per curiam)* [exclusion of jurors based merely on voiced general objections to the death penalty]; *Sheppard* v. *Maxwell* (1966) 384 U.S. 333, 345 [16 L.Ed.2d 600, 610-611, 86 S.Ct. 1507] [jurors constantly exposed to media coverage prior to and during the defendant's trial].)

Like the Ninth Circuit, the Fifth Circuit Court of Appeals' application of a harmless error analysis to a trial court's ruling on peremptory challenge has been based on the specific facts of the case. In *U.S.* v. *Broussard* (5th Cir. 1993) 987 F.2d 215, the Fifth Circuit refused to apply a harmless error analysis to a trial court's ruling on a *Batson* challenge because the juror against whom the challenge was erroneously denied sat as a member of the jury. "Applying the doctrine *in this context* would eviscerate the right to exercise peremptory challenges, because it would be virtually impossible to determine that these rulings, injurious to the perceived fairness of the petit jury, were harmless." (*Id.* at p. 221, italics added.) On the other hand, in *U.S.* v. *Evans* (5th Cir. 1988) 848 F.2d 1352, the Fifth Circuit applied a harmless error analysis to a trial court's error in denying a defendant's request for an additional peremptory challenge when two alternate jurors were selected. "Because neither of the alternate jurors served on the jury, the fact that Evans was denied a right to use a peremptory challenge against one of them could have had no effect on the trial." (*Id.* at p. 1357.)

Finally, we give some consideration to the dictum of the court in *U.S.* v. *Canoy* (7th Cir. 1994) 38 F.3d 893, 899, footnote 6: "There is some authority for the proposition that a *Batson* error relating to an alternate juror may be harmless where no alternate actually deliberates on the verdict. *See United States v. Lane*, 866 F.2d 103, 106 n. 3 (4th Cir. 1989); *Nevius v. Sumner*, 852 F.2d 463, 468 (9th Cir. 1988), *cert. denied*, 490 U.S. 1059, 109 S.Ct. 1972, 104 L.Ed.2d 441 (1989); *Roberts v. Singletary*, 794 F.Supp. 1106, 1125 (S.D.Fla. 1992), *aff'd*, 29 F.3d 1474 (11th Cir. 1994). Yet the government did not whole-heartedly embrace such a rule when we raised the issue at oral

argument. We need not take a position today, however, as we decide below that the government did not engage in purposeful race discrimination in any event. But we note that a harmless error rule may conflict with the Supreme Court's recent pronouncements in this area. For example, in *Powers v. Ohio*, 499 U.S. 400, [412], 111 S.Ct. 1364, 1371, 113 L.Ed.2d 411 (1991), the Court explained that:

"A prosecutor's wrongful exclusion of a juror by a race-based peremptory challenge is a constitutional violation committed in open court at the outset of the proceedings. The overt wrong, often apparent to the entire jury panel, casts doubt over the obligation of the parties, the jury, and indeed the court to adhere to the law throughout the trial of the cause. The *voir dire* phase of the trial represents the jurors' first introduction to the substantive factual and legal issues in a case. The influence of the *voir dire* process may persist through the whole course of the trial proceedings."

We disagree, and conclude *Canoy*'s reliance on *Powers* as authority for the proposition that a *Batson* error must be considered error per se, is an overstatement. In *Powers*, the United States Supreme Court addressed the issue of whether a White defendant could object to the prosecution's peremptory challenge of Black venirepersons. (*Powers v. Ohio* (1991) 499 U.S. 400, 404 [113 L.Ed.2d 411, 420-421, 111 S.Ct. 1364].) Answering the question in the affirmative, the court analyzed whether the White defendant had standing to assert the deprivation of equal protection on the part of the Black venirepersons who were excluded. It was in this context that the comments quoted in *Canoy* were made. (*Id.* at pp. 411-412 [113 L.Ed.2d at pp. 425-426].) But, the court made it clear that ultimately the error had to somehow *prejudice* the defendant. "The discriminatory use of peremptory challenges by the prosecution causes a criminal defendant cognizable injury, and the defendant has a concrete interest in challenging the practice." (*Id.* at p. 411 [113 L.Ed.2d at p. 425].) Additionally, the quote from *Powers* that "[t]he influence of the *voir dire* process may persist through the whole course of the trial proceedings," (*id.* at p. 412 [113 L.Ed.2d at p. 426]) is taken out of context. As the rest of the paragraph indicates, the court was specifically addressing the situation where a defendant has been completely denied the right to challenge the basis for peremptory challenges: "If the defendant has no right to object to the prosecutor's improper exclusion of jurors, and if the trial court has no duty to make a prompt inquiry when the defendant shows, by adequate grounds, a likelihood of impropriety in the exercise of a challenge, there arise legitimate doubts that the jury has been chosen by proper means. The composition of the trier of fact itself is called in question, and the irregularity may pervade all the proceedings that follow." (*Powers v. Ohio, supra*, 499 U.S. at pp. 412-413 [113 L.Ed.2d at p.

426].) In other words, the court was addressing the effect of a rule which precluded the defendant from even raising the issue of the discriminatory use of peremptory challenges. It was not considering whether a trial court erred in any particular case in ruling on such challenges or, even more relevant to defendant, whether the court erred in the remedy it fashioned when it denied the peremptory challenge.

State courts outside of California which have addressed the issue are divided on whether to apply harmless error. The Court of Criminal Appeals of Texas addressed the issue in the context of a claim of ineffective assistance of counsel. (*Batiste* v. *State* (Tex.Crim.App. 1994) 888 S.W.2d 9.) Batiste claimed his trial counsel was ineffective because he failed to pre-serve a *Batson* error. (*Batiste* v. *State, supra,* 888 S.W.2d at p. 10.) Relying on its interpretation of *Arizona* v. *Fulminante, supra,* 499 U.S. 279, and *Vasquez* v. *Hillery, supra,* 474 U.S. 254, the court declined to apply harmless error to any alleged *Batson* error. "We therefore assume, without deciding, that *Batson* error is not amenable to a *Chapman* analysis for harmless error." (*Batiste* v. *State, supra,* 888 S.W.2d at pp. 13-14.) Notwithstanding this finding, the court went on to hold the failure of the defendant's trial counsel to ensure racial discrimination did not take place during jury selection was not "so great as to justify exempting ineffective counsel claims for lack of a *Batson* objection from *Strickland's* 'prejudice' prong." (*Id.* at p. 15.) Conse-quently, the court really did apply a harmless error analysis. It did so in the context of attempting to determine if there was a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different, as required by *Strickland* v. *Washington, supra,* 466 U.S. 668.

On the other hand, the Court of Criminal Appeals of Alabama has found a harmless error analysis is appropriate when analyzing a *Batson* error. (*Macon* v. *State* (Ala.Crim.App. 1994) 652 So.2d 331.) In *Macon,* the defendant alleged on appeal that the prosecutor did not give a race-neutral reason for his peremptory challenge of a venireperson, in violation of *Batson* v. *Kentucky, supra.* (*Id.* at p. 332.) Shortly after the venireperson had been challenged, she received a telephone call that her father was seriously ill. The trial court excused her from jury service, and did not give the prosecutor another challenge. The court held even if the prosecutor had not been able to give a race-neutral reason for excusing the venireperson, the defendant could not have been prejudiced by it. (*Id.* at p. 333.) The court was referring to the fact that even if the peremptory challenge had been denied, the person against whom it was directed would not have sat as a juror in any case. Thus, application of a harmless error analysis was justified.

*(b) The trial court's failure to dismiss the panel and begin jury selection anew was a "trial defect."*

 Recognizing this is a case of first impression, we conclude there are compelling reasons to apply a harmless error analysis based on the unique facts of defendant's case. First, the trial court actually granted trial counsel's *Wheeler* motion with respect to the alternate juror. This sets defendant's case apart from the overwhelming majority of cases considered on appeal, where the issue is the erroneous denial of a *Wheeler* motion or a refusal to consider a *Wheeler* motion altogether. Here, the trial court complied with the requirements of *Batson* and *Wheeler*, by requiring the prosecution to explain the basis for its peremptory challenge once the defendant had established a prima facie case of discrimination. Upon finding the prosecution had not carried its burden, the trial court denied the challenge and ordered the juror seated. The trial court exercised its authority as required by *Batson* and *Wheeler* to protect defendant's right to equal protection under the United States and California Constitutions. Thus, any error committed by the trial court was in the execution of its duties, not in an outright failure to perform them.

Of even more importance is an obvious and critical factual distinction between *Wheeler* (as well as the federal and state cases which do not apply a harmless error analysis), and this case. In *Wheeler*, the Supreme Court found that peremptory challenges had been improperly exercised during selection of the *12-member jury*. Implicitly, the same result would ensue if the peremptory challenges were improperly exercised during selection of alternates where any one alternate was ultimately seated as a juror. In either situation, the trial court's error would have a direct impact on the jury which decided the defendant's fate. This is a common thread that runs through virtually every case where a court has declined to apply a harmless error analysis to a *Wheeler/Batson* issue.

Underlying this position is a natural reluctance on the part of appellate courts to speculate with respect to what impact, if any, the error had on the fact finder.

"To subject the denial of a peremptory challenge to harmless-error analysis would require appellate courts to do the impossible: to reconstruct what went on in jury deliberations through nothing more than post-trial hearings and sheer speculation. In the context of an appeal based on denial of a peremptory challenge, there is inadequate evidence for an appellate court to determine the degree of harm resulting from the seating of a juror [or failure to sit a juror] despite a defendant's attempted peremptory strike." (*U.S.* v. *Annigoni, supra*, 96 F.3d at p. 1145.)

Here, the trial court's error involved a prospective *alternate* juror. No alternate jurors were ever seated as jurors. With the benefit of hindsight, we can determine whether the defendant suffered any harm as a result of the trial court's error only because no alternate juror was ever called upon to decide the defendant's guilt or innocence. This one crucial fact sets defendant's case apart from *Wheeler* and all those cases in which harmless error was not applied. Citing the United States Supreme Court's decision in *Rose* v. *Clark* (1986) 478 U.S. 570 [92 L.Ed.2d 460, 106 S.Ct. 3101], the California Supreme Court in *People* v. *Dyer* (1988) 45 Cal.3d 26, 62-63 [246 Cal.Rptr. 209, 753 P.2d 1], stated:

"*Rose* draws a distinction between fundamental trial errors that are reversible per se, and other federal constitutional errors which are subject to a harmless error analysis under *Chapman* [v. *California* (1967) 386 U.S. 18 (17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065)], the former being the exception: 'We have emphasized . . . that while there are some errors to which *Chapman* does not apply, they are the exception and not the rule. [Citation.] Accordingly, if the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless-error analysis. The thrust of the many constitutional rules governing the conduct of criminal trials is to ensure that those trials lead to fair and correct judgments. Where a reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt, the interest in fairness has been satisfied and the judgment should be affirmed.' (*Rose*, *supra*, 478 U.S. at p. 579 . . . .)"

The alternate juror the court found was improperly challenged peremptorily would not have sat on defendant's case, even if she had never been challenged in the first place. She was an alternate juror and no alternate juror was called upon to serve. The concern that her exclusion would have a pervasive effect on the trier of fact in defendant's case, or that it is impossible to determine the effect on the triers of fact, is simply not present. Therefore, we conclude the trial court's error was not "structural" but a "trial error," and must be analyzed to determine if it was harmless error.

 Analyzing constitutional error to determine if it is harmless requires this court to find there has not been a "miscarriage of justice." (Cal. Const., art. VI, § 13.) A miscarriage of justice occurs " 'only when the court "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*People* v. *Cahill*, *supra*, 5 Cal.4th at p. 492, quoting *People* v. *Watson*, *supra*, 46 Cal.2d at p. 836.) Looking at the facts of defendant's case,

it cannot be said there is a reasonable probability the result of his trial would be more favorable to him if the alternate juror had not been challenged peremptorily, or if she had remained and sat as an alternate. Even if she had remained, she would never have had an opportunity to sit as a fact finder, and therefore, to influence the outcome of defendant's trial one way or the other.

Lest there be any misunderstanding, we emphasize that our finding of harmless error with respect to the *Wheeler/Batson* motion is limited to the specific facts of this case: a peremptory challenge against an alternate juror who was never called upon to sit in judgment of the defendant. Whether to apply harmless error or a reversible per se test if the error involved a venireperson who actually sat as a member of defendant's jury is not before this court today. Our decision in this case is nothing more than a recognition of the words of the late Justice Traynor: "The practical objective of tests of harmless error is to conserve judicial resources by enabling appellate courts to cleanse the judicial process of prejudicial error without becoming mired in harmless error. The grand objective is to conserve the vitality of the rules and procedures designed to assure a fair trial. Only when the law is the soul of fairness can it be truly the soul of reason." (Traynor, The Riddle of Harmless Error, *supra*, at p. 81.)

Thus, having found any error with respect to the peremptory challenge of the alternate juror was harmless beyond a reasonable doubt, we hold the appropriate remedy is to remand this matter to allow the trial court to conduct a hearing to determine the validity of the prosecutor's peremptory challenges to prospective jurors Amelia R. and Donna S. We obviously have no way of knowing what will be the outcome of such a hearing. For the guidance of the trial court, we make the following observations: If the trial court determines the prosecutor's reasons for excusing jurors Amelia R. and Donna S. were not racially neutral, and grants defendant's *Wheeler/Batson* motion, reversal and retrial is mandated. (*People* v. *Wheeler, supra,* 22 Cal.3d 258, 283; *People* v. *Gore, supra,* 18 Cal.App.4th at p. 707; *People* v. *Smith* (1993) 21 Cal.App.4th 342, 346 [25 Cal.Rptr.2d 850].)

By the same token, if the trial court determines the prosecutor's reasons for excusing prospective jurors Amelia R. and Donna S. were racially neutral, and denies defendant's *Wheeler/Batson* motion, defendant's conviction must be reinstated.

II.-IV.*

• • • • • • • • • • • • • • • • • • • • • •

*See footnote, *ante*, page 1013.

## DISPOSITION

This matter is remanded to allow the trial court to conduct a hearing to determine the validity of the prosecutor's peremptory challenges to prospective jurors Amelia R. and Donna S. If the trial court determines the prosecutor's reasons for excusing the two jurors were not racially neutral, and grants defendant's *Wheeler/Batson* motion, reversal and retrial is required. If the trial court determines the prosecutor's reasons for excusing the two jurors were racially neutral, and denies defendant's *Wheeler/Batson* motion, defendant's conviction is ordered reinstated.

Dibiaso, Acting P. J., and Vartabedian, J., concurred.

A petition for a rehearing was denied November 26, 1996, and appellant's petition for review by the Supreme Court was denied February 19, 1996. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.