973 F.2d 1499
 24 Fed.R.Serv.3d 108
 Guadalupe MEDRANO; Amparo Medrano, Plaintiffs-Appellants,
and
Guadalupe Medrano, Jr.; Louie Medrano; Lucia Medrano
Casillas, Plaintiffs,
v.
CITY OF LOS ANGELES; Vance Proctor; William Hall; Rodolfo
Romero; Donnelly Mowry, Defendants-Appellees.
 No. 90-55250.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 7, 1992.
Decided Sept. 8, 1992.
 
 Robert Mann and Donald W. Cook, Los Angeles, Cal., for plaintiffs-appellants.
 Richard Mah, Deputy City Atty. and Richard M. Helgeson, Asst. City Atty., Los Angeles, Cal., for defendants-appellees.
 Appeal from the United States District Court for the Central District of California.
 Before FARRIS, WIGGINS, and FERNANDEZ, Circuit Judges.
 WIGGINS, Circuit Judge:
 
 OVERVIEW
 
 1
 The widow, parents, and siblings of Ruben Medrano seek damages from Los Angeles Police Department officers and the City of Los Angeles under 42 U.S.C. section 1983 for the shooting of Medrano. The Medranos appeal from directed verdicts and a jury verdict against their section 1983 claims. This court has jurisdiction over the appeal pursuant to 28 U.S.C. section 1291.
 
 BACKGROUND
 
 2
 On March 21, 1988, Ruben P. Medrano left a suicide note, locked himself in his bathroom with a loaded .357 magnum revolver, injected himself with a lethal dosage of heroin, and threatened to kill anyone who tried to enter the bathroom to prevent his suicide. After his wife of three weeks, Linda Medrano, and his sister, Lucia Medrano, were unable to persuade Ruben Medrano to come out of the bathroom, they called 911 for emergency assistance. Paramedics and Los Angeles Police Department officers responded to the call. The police officers removed all of the family members from the area and initiated communication with Medrano. Medrano informed the police that he wanted to commit suicide and that he would kill anyone who came through the bathroom door to interfere.
 
 
 3
 During the communications with Medrano, the Medrano family members were allowed to speak with Ruben Medrano to persuade him to come out of the bathroom. The police took measures to prevent these family members from being shot in case Ruben Medrano opened fire. After Ruben became agitated and demanded that the family members leave, the police determined that they should be removed from the immediate area. The police continued to communicate with Ruben Medrano until he no longer responded and they could hear him snoring in the bathroom. Aware that Ruben Medrano could die of a heroin overdose if he was not removed from the bathroom, the police decided that Officer Mowry, a qualified crisis negotiator, should attempt to negotiate Ruben Medrano out of the bathroom if he was awake or to enter the bathroom to take custody of Medrano if he was still sleeping.
 
 
 4
 After listening at the bathroom door, the police formed the opinion that Ruben Medrano was in a drug induced state of unconsciousness and decided to enter the bathroom. Officer Mowry forced the door open and entered the bathroom. Lying on the floor, Ruben Medrano woke up and fired one shot into the wall behind him. Officer Mowry grabbed the gun in Ruben Medrano's hand and struggled with Medrano for possession of the gun. Officer Romero then entered the bathroom and fired two shots into Ruben Medrano's chest. After Ruben Medrano continued struggling for possession of the gun, Officer Romero fired a final shot into Ruben Medrano's head. Medrano died at the scene.
 
 
 5
 However, the exact circumstances surrounding the fatal shooting of Ruben Medrano are disputed. When the police entered the bathroom, the Medranos heard three consecutive shots and then a delayed shot at the end. The Medranos believe that Ruben Medrano never fired his .357 magnum. According to the Medranos, the police shot Medrano three times and then staged a shot from Medrano's .357 magnum after he was already dead.
 
 
 6
 Ruben Medrano's wife, parents, and siblings brought suit against many of the police officers involved in this incident and against the City of Los Angeles. Seeking damages under 42 U.S.C. section 1983, the Medranos alleged that the police violated Ruben Medrano's constitutional rights by using excessive force and that the police conspired to cover up the actual events that occurred when the police entered the bathroom. The Medranos also brought several state law claims in this action, but the district court refused to exercise pendent jurisdiction over these claims and dismissed them. The district court directed a verdict in favor of the City of Los Angeles. In addition, the district court either dismissed or directed verdicts in favor of all the individual defendants except for Officers Mowry and Romero, the two police officers who struggled with and shot Ruben Medrano. The jury returned a verdict in favor of these two officers. The Medranos appeal the directed verdicts against them, the dismissal of Chief Gates from the lawsuit, and numerous rulings that the court made during the trial.
 
 DISCUSSION
 I. The Notice of Appeal
 
 7
 The appellees argue that our review should be limited to the denial of the Medranos' new trial motion because the notice of appeal mentions only the district court's order denying the motion for a new trial and says nothing about the earlier judgment. The appellees rely on Rule 3(c) of the Federal Rules of Appellate Procedure: "The notice of appeal ... shall designate the judgment, order or part thereof appealed from...." Fed.R.App.P. 3(c). This argument, however, ignores the Supreme Court's holding in Foman v. Davis, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Like the Medranos in the case at bar, the appellant in Foman had filed an appeal from the judgment that was premature because of a pending motion to alter or amend the judgment under Fed.R.Civ.P. 59.[1] Id. at 180, 83 S.Ct. at 229. Like the Medranos, the appellant in Foman filed a second notice of appeal after the district court denied the Rule 59 motion. Id.
 
 
 8
 Also like the present case, the appellee in Foman argued that the second appeal was limited to the district court's denial of the Rule 59 motion because the notice of appeal failed to specify that the appeal was being taken from the judgment as well as from the order denying the Rule 59 motion. The Supreme Court squarely rejected this analysis:
 
 
 9
 The defect in the second notice of appeal did not mislead or prejudice the respondent. With both notices of appeal before it (even granting the asserted ineffectiveness of the first), the Court of Appeals should have treated the appeal from the denial of the motions as an effective, although inept, attempt to appeal from the judgment sought to be vacated. Taking the two notices and the appeal papers together, petitioner's intention to seek review of both the [judgment] and the denial of the motions was manifest. Not only did both parties brief and argue the merits of the earlier judgment on appeal, but petitioner's statement of points ... similarly demonstrated the intent to challenge the [judgment].
 
 
 10
 It is too late in the day and entirely contrary to the spirit of the Federal Rules of Civil Procedure for decisions on the merits to be avoided on the basis of such mere technicalities.
 
 
 11
 Id. at 181.
 
 
 12
 The appellees are unable to distinguish the present case from Foman. Contrary to the appellees' assertions, when a prior notice of appeal from a judgment is premature, Fed.R.App.P. 3(c) allows a later notice of appeal from the denial of a Rule 59 motion to serve as a notice of appeal from the underlying judgment. Id.; In re Nicholson, 779 F.2d 514, 515-16 (9th Cir.1985); see also Torres v. Oakland Scavenger Co., 487 U.S. 312, 316-17, 108 S.Ct. 2405, 2408, 101 L.Ed.2d 285 (1988) (explaining Foman ). Foman clearly governs this issue, and we therefore treat the Medranos' notice of appeal as an appeal from the earlier judgment of the court.
 
 II. The Peremptory Challenges
 
 13
 The Medranos argue that the district court erred by allowing the appellees one peremptory challenge to remove an alternate juror and then refusing to allow the Medranos the same right. The district court first gave the Medranos the opportunity to exercise a peremptory challenge to remove one of the two alternate jurors (Mrs. Spitz and Mr. Andriacchi). The Medranos accepted the alternates as called. The appellees, however, used their one peremptory challenge to excuse Mrs. Spitz and replace her with Mr. Herrington. The Medranos then attempted to use their one peremptory challenge to remove Mr. Herrington. The court ruled that the Medranos had already used their peremptory by accepting the alternates. The court stated, "You only have one. You accepted the panel. You lost it." The Medranos tried to explain that they had indeed accepted Mr. Andriacchi but had never accepted Mr. Herrington. The court, however, rejected the Medranos' argument and swore the alternates.
 
 
 14
 The district court erred by ruling that the Medranos waived their peremptory challenge by accepting a panel before a new juror became a member of the panel. The case law is clear on this issue:
 
 
 15
 "[A]cceptance of a panel cannot be deemed a waiver of a peremptory challenge in respect of [sic] a person who was not a member of the panel at the time the jury was accepted." [United States v. Turner, 558 F.2d 535, 538 (9th Cir 1977) ]. [Plaintiff's] acceptances of the panel did not waive his right to an otherwise unexhausted peremptory challenge against the [replacement juror], who was not a member of the panel when [the plaintiff] did accept it.
 
 
 16
 Landes Constr. Co. v. Royal Bank of Canada, 833 F.2d 1365, 1369 (9th Cir.1987). Even the appellees appear to concede that the district court erred. Thus, the issue is whether the error was reversible error.
 
 
 17
 The appellees argue that the erroneous denial of a peremptory challenge to an alternate juror is harmless error. They argue that Beard v. Mitchell, 604 F.2d 485, 500 (7th Cir.1979) sets forth "the doctrine with respect to alternate jurors." However, Beard merely holds that the error is harmless if the alternates never replace any member of the jury. Id. at 500. In contrast to Beard, the challenged alternate in this case replaced a member of the jury and rendered a verdict. An erroneous denial of a peremptory challenge with respect to a person who becomes a member of the jury results in an automatic reversal. See Turner, 558 F.2d at 538; Carr v. Watts, 597 F.2d 830, 833 (2d Cir.1979). The denial of the peremptory challenge in this case was reversible error. Therefore, we reverse and remand for a new trial.[2]
 
 
 18
 III. The Supervisory and Investigatory Defendants
 
 
 19
 The district court granted directed verdicts in favor of most of the individual defendants in this case. The district court's grant of a motion for a directed verdict or a motion for JNOV is reviewed by applying the same standard that must be used by the district court. A directed verdict or JNOV is proper when "the evidence and its inferences, considered as a whole and viewed in the light most favorable to the nonmoving party, can support only one reasonable conclusion." The Jeanery, Inc. v. James Jeans, Inc., 849 F.2d 1148, 1151 (9th Cir.1988).
 
 
 20
 The Medranos argue that the on scene supervisors and team leaders (Sergeants Tumas, Slinkard, Hancock and Officer Anderson) are liable under section 1983 for ordering officers to break into the bathroom and take Medrano into custody. Without evidence that the supervisors authorized excessive force, liability cannot be based merely on the decision to enter the bathroom. The uncontradicted evidence in this case shows (1) that Medrano would die of a drug overdose unless he was taken from the bathroom and given medical treatment, (2) that efforts to talk him out of the bathroom had failed, and (3) that he was not responding to any communication and appeared to be unconscious already. Given these facts, the decision to enter the bathroom was reasonable. The Medranos have failed to explain how the decision to enter the bathroom violated the law. There is no law requiring the on scene supervisors to stand by and let Medrano die of a drug overdose, and there is no evidence showing that the on scene supervisors knew or should have known that the decision to enter the bathroom would cause some unconstitutional injury. Without some evidence that the on scene supervisors authorized use of excessive force, the decision to enter the bathroom cannot reasonably support a judgment in favor of the Medranos. See Meehan v. County of Los Angeles, 856 F.2d 102, 106 (9th Cir.1988) (absent evidence that a supervisor instructed or authorized use of excessive force, a directed verdict is proper).
 
 
 21
 The Medranos also allege that the officers investigating the Medrano incident (Captain Proctor and Lieutenant Hall) conspired in a cover-up. The Medranos argue that their description of the gun shot sounds differs from the description in the police report. However, the Medranos' characterization of the police report is misleading. The police report and the officers' testimony at trial is consistent with the gun shot sounds reported by the Medranos. Simply put, the alleged difference in the description of the gun shot sounds is insufficient to support a jury verdict against Proctor and Hall on a cover-up conspiracy theory.
 
 
 22
 The flash burn on Medrano's chest from the .357 magnum is also insufficient to support a jury verdict against Proctor and Hall on a cover-up conspiracy theory. Both expert pathologists at trial stated that the flash burn could be ante-mortem. Thus, the evidence is entirely consistent with the investigatory conclusion that the flash burn occurred when Ruben Medrano fired the gun into the wall as he was lying on the floor.
 
 
 23
 According to Dr. Thomas, the tissue reaction to the flash burn proved that the burn was ante-mortem. Dr. Shipley also admitted that the burn could be ante-mortem. Thus, it is not evidence of a cover-up conspiracy that Proctor and Hall either assumed the burns were ante-mortem or simply did not suspect that the burns were post-mortem. Given the facts known by Proctor and Hall, and without expert medical evidence to the contrary, the most reasonable assumption was that the burns were ante-mortem. Moreover, Proctor and Hall do not possess the medical training to determine from a visual inspection whether a flash burn is ante-mortem or post-mortem, and they cannot be held liable merely because they made a reasonable assumption in the course of their investigation that the burn occurred when Medrano fired the gun. In short, there is simply no evidence that Proctor or Hall were involved in a cover-up.
 
 
 24
 The Medranos finally assert that, similar to the on scene supervisors, the Chief of Police (Chief Gates) is liable for formally approving forced entry as a means to obtain custody of an armed individual who is dying of a drug overdose and who has ceased communications. The Medranos argue that because forced entry is "reckless" and "ill-advised," the Chief of Police is liable under section 1983. Like the Medranos' claims against the on scene supervisors, the Medranos have failed to show that a decision to make a forced entry violates federal law. Indeed, the Medranos have failed to show that forced entry is even reckless or ill-advised. A decision to allow a forced entry alone is insufficient to support a jury verdict against the Chief of Police. The district court did not err in dismissing the Chief of Police from this lawsuit.
 
 
 25
 In summary, the district court did not err in granting the motion for directed verdicts in favor of defendants Tumas, Slinkard, Hancock, Anderson, Proctor, and Hall. Nor did the court err by dismissing Gates from the lawsuit.
 
 
 26
 IV. The Directed Verdict for the City of Los Angeles
 
 
 27
 The Medranos argue that a municipality may be held vicariously liable for an employee's violation of section 1983 if state law mandates such liability. In Hesselgesser v. Reilly, 440 F.2d 901 (9th Cir.1971), this court determined that "the Civil Rights Act does authorize the application, under appropriate circumstances, of state laws pertaining to vicarious liability and liability created by statute." Id. at 903. The court in Hesselgesser also held that the prime issue is whether state law imposes vicarious liability for the actions of public employees. Id. Relying upon Hesselgesser, the Medranos argue that 42 U.S.C. sections 1983 and 1988 provide an action against the City of Los Angeles because municipalities are vicariously liable under Cal.Gov't Code section 815.2(a) for actions of employees in the course and scope of their employment.
 
 
 28
 This court and the Supreme Court have rejected this argument. In Moor v. Madigan, 458 F.2d 1217, 1219-20 (9th Cir.1972), aff'd in part, Moor, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973), this court limited Hesselgesser and held that the municipal liability created by California under section 815.2(a) did not expand the remedies available under federal law. The Supreme Court agreed with this analysis and affirmed this part of the Ninth Circuit's opinion in Moor v. County of Alameda, 411 U.S. 693, 698-710, 93 S.Ct. 1785, 1789-96, 36 L.Ed.2d 596 (1973). The Court held that Congress did not intend to impose vicarious liability on municipalities under section 1983 and that, although states are free to impose vicarious liability, section 1983 cannot be used as the means to impose such liability. Id. at 710 & n. 27, 93 S.Ct. at 1796; see also Monell v. New York City Dept. of Social Servs., 436 U.S. 658, 691-94, 98 S.Ct. 2018, 2036-37, 56 L.Ed.2d 611 (1978). Section 1983 is an express federal damages remedy that cannot be expanded by state law. See Jett v. Dallas Indep. School Dist., 491 U.S. 701, 732-33, 109 S.Ct. 2702, 2720-21, 105 L.Ed.2d 598 (1989).
 
 
 29
 In short, the Medranos' reliance on Hesselgesser and section 815.2(a) is misplaced. Federal courts may look to state law under Hesselgesser only "under appropriate circumstances," 458 F.2d at 1220 (quoting Hesselgesser, 440 F.2d at 903), where the state law is consistent with the damages remedy provided by Congress.
 
 
 30
 The Medranos also argue that the City of Los Angeles is liable under section 1983 because it had a custom, practice, or policy of allowing forced entry as a method of dealing with an armed person who was overdosing on drugs and who had ceased communications. As discussed above, the Medranos have failed to produce any evidence that such a practice violates federal law. The record fails to support even the Medranos' vague conclusory allegations that the practice is reckless and ill-advised. Therefore, the district court did not err in granting the motion for a directed verdict in favor of the City of Los Angeles.
 
 V. Pendent Jurisdiction
 
 31
 The Medranos also argue that the district court erred by refusing to exercise pendent jurisdiction over the Medranos' state law claims because all of the claims are derived from a common nucleus of operative fact. The Medranos misunderstand the two-part analysis governing pendent jurisdiction. The Medranos are correct that a federal court has the power to entertain state law claims when both the federal and state claims "derive from a common nucleus of operative fact." Moor, 411 U.S. at 711, 93 S.Ct. at 1797 (quoting United Mine Workers of America v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966)). However, whether the court has the power to exercise pendent jurisdiction does not end the inquiry. "That power need not be exercised in every case in which it is found to exist. It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right." Gibbs, 383 U.S. at 726, 86 S.Ct. at 1139; see also Moor, 411 U.S. at 716, 93 S.Ct. at 1799 (district courts are given "broad discretion" in evaluating whether pendent jurisdiction is appropriate).
 
 
 32
 In this case, the state claims involved complicated state law issues of ascendant and collateral heirship, intestate succession, negligent retention, and negligent infliction of emotional distress. Thus, the district court used its discretion so that it "would [not] be called upon to resolve difficult questions of California law." Moor, 411 U.S. at 715-16, 93 S.Ct. at 1799 (citation omitted). Moreover, "an examination of the posture in which the nonfederal claim[§ were] asserted" reveals that the Medranos voluntarily chose to pursue their state law claims in federal court. Owen Equipment & Erection Co. v. Kroger, 437 U.S. 365, 373, 98 S.Ct. 2396, 2402, 57 L.Ed.2d 274 (1978). "A plaintiff cannot complain if ancillary jurisdiction does not encompass all of his possible claims in a case such as this one, since it is he who has chosen the federal rather than the state forum and must thus accept its limitations." Id. at 376, 98 S.Ct. at 2404. If the Medranos wanted to bring all of their claims in the same forum, they should have selected the state court. The district court did not abuse its discretion in dismissing the Medranos' state law claims.
 
 VI. Jury Instructions
 
 33
 In reviewing jury instructions, the standard applied in this circuit is "whether, considering the charge as a whole, the court's instructions fairly and adequately covered the issues presented, correctly stated the law, and were not misleading." Thorsted v. Kelly, 858 F.2d 571, 573 (9th Cir.1988); see also United States v. Beltran-Rios, 878 F.2d 1208, 1214 (9th Cir.1989). The district court's jury instructions meet this standard.
 
 
 34
 The Medranos complain that the court's remarks to the jury at the beginning of the trial misstated the law as requiring racial animus as an element of an excessive force claim. Taking the jury instructions as a whole, it is clear that the court did not misstate the law. At the beginning of the trial, the court made it clear that the Medranos were claiming that excessive force violates a constitutional right to the security of a person's body. The court did tell the jury that the Medranos may have to prove that the excessive force was motivated, as the complaint alleged, by some racial or ethnic animus. However, the court warned the jury that the court needed to do more research to determine whether the use of excessive force alone is a constitutional violation. When the court completed its research and instructed the jury at the end of the trial, the court made it clear that the Medranos needed only to show excessive or unreasonable force to prevail. The alleged misstatement of the law is only a misstatement if it is read out of context and the instructions are not considered as a whole.
 
 
 35
 The district court also instructed the jury that a citizen has no power to relieve police officers from their duty to protect the public by signing some kind of waiver. The Medranos argue that this is a misstatement of the law and that a citizen, by signing a waiver, may relieve the police of their legal responsibility to protect the public. The Medranos have failed to provide any authority to support this argument, and there is no California law granting citizens the right to relieve police of their duty by signing a waiver. The district court did not misstate the law on this issue.
 
 VII. Evidentiary Rulings
 
 36
 Evidentiary rulings are reviewed for an abuse of discretion and will be sustained unless they are "manifestly erroneous." Transgo, Inc. v. Ajac Transmission Part Corp., 768 F.2d 1001, 1020 (9th Cir.1985), cert. denied, 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986); Roberts v. College of the Desert, 870 F.2d 1411, 1418 (9th Cir.1988). The district court ruled (1) that Mr. Saunders had no specialized knowledge that would assist the trier of fact under Fed.R.Evid. 702; (2) that Mr. Flores did possess specialized knowledge that would assist the jury under Fed.R.Evid. 702; (3) that the relevance of additional materials written by Mr. Klyver and other training materials was substantially outweighed by the danger of confusion of the issues, undue delay, and waste of time under Fed.R.Evid. 403; (4) that under Fed.R.Evid. 602 there was no foundation for testimony regarding an alleged conversation because the witness could not remember having the conversation and had made no notes of such a conversation; (5) that circumstantial evidence was sufficient to establish the authenticity of certain notes from the investigation of the Medrano incident under Fed.R.Evid. 901(a) and that the notes were excepted from the hearsay rule under Fed.R.Evid. 803(8); and (6) that under Fed.R.Evid. 703 Dr. Thomas's expert opinion could be based in part on slides provided by defense counsel showing the body of Medrano after the fatal incident. Although reasonable minds could have reached different conclusions, the district court's rulings are not manifestly erroneous. Therefore, we affirm these evidentiary rulings.
 
 
 37
 However, the district court allowed the appellees to impeach the testimony of the Medranos' witnesses by use of misdemeanor convictions and arrests. The Medranos' objections to this method of impeachment were timely, and they preserved this alleged error for appeal. Fed.R.Evid. 609 does not allow the use of prior arrests for purposes of impeachment. Although Rule 609 does allow the use of convictions for impeachment, it limits the use of misdemeanor convictions to those involving dishonesty or false statements. Fed.R.Evid. 609(a)(2). The misdemeanor convictions used for impeachment in this case were mainly drug use and shoplifting convictions. These convictions did not involve dishonesty or false statements. See United States v. Ortega, 561 F.2d 803, 805-06 (9th Cir.1977) (shoplifting does not involve dishonesty or false statements within the meaning of Rule 609(a)(2)); United States v. Ashley, 569 F.2d 975, 979 (5th Cir.) (same), cert. denied, 439 U.S. 853, 99 S.Ct. 163, 58 L.Ed.2d 159 (1978). Therefore, the district court erred by allowing the use of these convictions for impeachment.
 
 VIII. Voir Dire
 
 38
 The Medranos argue that the district court erred by refusing to ask questions regarding the jurors' attitudes about suicide, drug use, firearms, racial prejudice, the proper extent of police authority, police abuse of authority, excessive force, and the appropriateness of awarding monetary damages for death and injuries. "A district court has considerable discretion to accept or reject proposed questions, however, and as long as it conducts an adequate voir dire, its rejection of a [party's] specific questions is not error." United States v. Giese, 597 F.2d 1170, 1182-83 (9th Cir.), cert. denied, 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (1979); see also Rosales-Lopez v. United States, 451 U.S. 182, 189, 101 S.Ct. 1629, 1634, 68 L.Ed.2d 22 (1981) (federal judges have "ample discretion" to determine which questions to ask in voir dire). The district court gave the jurors an overview of the case and then questioned the jurors regarding employment, marital status, spouse's employment, and whether any friends or relatives were members of law enforcement agencies. The court also asked the jurors whether they had any prejudices or biases that would prevent them from being fair and impartial in the case. Three jurors admitted that they might be unable to be impartial and were excused. After reviewing the record, we find that the district court's voir dire was adequate and that the court sufficiently probed for prejudice and bias. "[T]o conserve time and avoid confusion," the court was justified in refusing to ask the specific questions proposed by the Medranos. Giese, 597 F.2d at 1183. We therefore affirm the district court's voir dire.
 
 
 39
 IX. Assignment to a Different Judge on Remand
 
 
 40
 The Medranos assert that the district court judge showed such extreme and obvious bias at trial that the case should be remanded to a different judge. "In the absence of proof of personal bias, [this court] remand[s] to a new judge only under 'unusual circumstances.' " United States v. Sears, Roebuck & Co., 785 F.2d 777, 780 (9th Cir.) (quoting United States v. Arnett, 628 F.2d 1162, 1165 (9th Cir.1979)), cert. denied, 479 U.S. 988, 107 S.Ct. 580, 93 L.Ed.2d 583 (1986). In making this determination, the court must consider three factors:
 
 
 41
 (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.
 
 
 42
 Id. (quoting Arnett, 628 F.2d at 1165).
 
 
 43
 The first factor militates in favor of remanding this case back to the same judge. The Medranos have failed to show that the district court would be unable or unlikely to correct its erroneous rulings on remand. The second factor also militates in favor of remand to the same judge. The Medranos' attorneys and the court did show a mutual lack of respect, and the court was provoked into losing its patience and engaging in some injudicious behavior, such as criticizing the attorneys in front of the jury. However, most of the behavior that the Medranos rely upon, such as calling the attorneys "boobs," occurred outside the presence of the jury. After reviewing the record, we trust that the instances of injudicious conduct in front of the jury and the appearance of bias can be corrected (1) by admonishing the district court to avoid critiquing the attorneys' trial tactics in front of the jury and to avoid derogatory comments at all times and (2) by warning the attorneys to be on better behavior.
 
 
 44
 The third factor weighs heavily in favor of remand to the same judge. The district court is already familiar with the issues and theories advanced in this case. Reassignment to another court to start from scratch would entail a significant amount of waste and duplication. Therefore, we remand this case back to the same judge.
 
 CONCLUSION
 
 45
 The district court erred by ruling that the Medranos waived a peremptory challenge with respect to a new member of the panel by accepting a previous version of the panel that did not include the new member. The court also erred by allowing the use of misdemeanor convictions and arrests to impeach a witness. The remainder of the district court's rulings--including the dismissal of defendant Gates and the directed verdicts in favor of defendants Tumas, Slinkard, Hancock, Anderson, Proctor, and Hall--are affirmed. Therefore, we remand for a new trial against the two remaining defendants, Officers Mowry and Romero.
 
 
 46
 REVERSED in part and AFFIRMED in part.
 
 
 
 [1]
 The Medranos' appeal from the district court's judgment was dismissed as premature because a motion for a new trial under Rule 59(a) was pending
 
 
 [2]
 The appellees argue that the Medranos somehow waived their right to appeal the district court's erroneous ruling by failing to object when two of the regular jurors were excused in this case. This argument is meritless, and the appellees have failed to cite a single case which supports this theory. By failing to object when the jurors were excused, the Medranos probably did waive any claim that the two regular jurors were excused improperly, but they did not waive their earlier claim that one of the alternates should have been removed by a peremptory challenge