**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ARLENE GALDAMEZ,
              *Plaintiff-Appellant,*

v.

JOHN POTTER, Postmaster General,
              *Defendant-Appellee.*

No. 03-35682

D.C. No.
CV-00-01768-JJ

OPINION

Appeal from the United States District Court
for the District of Oregon
John Jelderks, Magistrate Judge, Presiding

Argued and Submitted
March 11, 2005—Portland, Oregon

Filed July 15, 2005

Before: Procter Hug, Jr., Marsha S. Berzon, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Hug

---

**COUNSEL**

Thomas F. Spaulding, Spaulding Cox & Schaeffer, LLP, Portland, Oregon, for the appellant.

Ronald K. Silver, Assistant United States Attorney, Portland, Oregon, for the appellee.

---

**OPINION**

HUG, Circuit Judge:

Arlene Galdamez appeals the district court's denial of her motion for a new trial following a defense verdict in her Title VII case against the United States Postal Service. We treat Galdamez's timely appeal from denial of the new trial motion as an appeal from final judgment. *See* 11 Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice & Procedure § 2818, at 191-93 (1995); *accord Medrano v. City of Los Angeles*, 973 F.2d 1499, 1502-03 (9th Cir. 1992); *In re Nicholson*, 779 F.2d 514, 515-16 (9th Cir. 1985). Therefore, we have jurisdiction under 28 U.S.C. § 1291. Although the district court correctly denied Galdamez's motion to amend the pretrial order and did not abuse its discretion in formulating either the jury instructions or the special verdict, it nonetheless erred by denying her request for an instruction on the Postal Service's potential liability for harassment by

customers and community members based on her race and national origin. Accordingly, we affirm in part, reverse in part, and remand for a new trial on Galdamez's harassment claim.

I

Factual and Procedural Background

Arlene Galdamez was born in Honduras and speaks English with a discernible accent. She began working for the Postal Service in 1983. In late 1993, she took over as postmaster in Willamina, Oregon. Galdamez immediately began to make a number of changes designed to bring the Willamina office into line with Postal Service regulations. For example, she insisted on timely payment of post office box fees, prohibited non-employees from entering non-public areas, and insisted on returning incorrectly addressed mail even when carriers knew how to deliver it. These changes were met by hostility and opposition from both customers and other postal workers. Customers complained to Jim Bogroff, her immediate supervisor, as well as William Jackson, the District Manager for Oregon. Local media also devoted considerable coverage to the controversy.

Galdamez, however, perceived a good deal of this hostility as stemming from her race, national origin, and accented English. Throughout her time in Willamina, she endured offensive verbal comments from customers and community members, references in local newspapers to her accent and foreign birth, direct and indirect threats to her safety, and vandalism to her car. According to Galdamez, her reports of harassment and requests for assistance were rebuffed by Bogroff and other Service managers.

Community opposition culminated in a petition drive and a "town hall" meeting, held on March 26, 1997, aimed at removing Galdamez from her position. The petition and meet-

ing were organized by Ron "Chris" Greenhill, a postal customer whose mail was delayed at the post office for some time because the Greenhills did not have a proper mail receptacle at their rural address. Despite requests from Galdamez, neither Bogroff nor Jackson attended the community meeting to defend her, and Jackson made a number of comments critical of her performance in interviews with local and regional newspapers.[1]

At around the same time, the Postal Service initiated a disciplinary investigation of Galdamez based on complaints that she was "rude" and that her insistence on regulatory compliance undermined good customer service. On March 21, 1997, Bogroff held an investigative interview with Galdamez and her representative, Bob Bernal.[2] During that meeting, Galdamez insisted that a great deal of the community criticism was motivated by her foreign birth and accent rather than her performance as postmaster. Several days later, Bogroff notified Galdamez that she was being placed on administrative leave effective April 1, 1997, and prohibited her from entering non-public areas of the post office. Bogroff then proposed formal discipline by way of a "Letter of Warning in Lieu of Time-Off Suspension," which Jackson later approved.

Galdamez filed this action in district court alleging race, color, and/or national origin discrimination in violation of Title VII. The parties consented to trial before a magistrate judge,[3] who entered a stipulated pretrial order setting forth the

---

[1]In contrast, when Janet Batchelor, a white postmaster, experienced similar community resistance to operational changes in another rural Oregon town, Jackson and other Service personnel attended a community meeting and provided considerable public support.

[2]Although postmasters are not union members, they are entitled to a representative from the National Association of Postmasters of the United States during disciplinary proceedings. On March 25, 1997, Ron Gates replaced Bob Bernal as Galdamez's representative.

[3]All references to the "district court" herein refer to proceedings before and rulings by the magistrate judge.

pertinent claims and issues of fact for trial. Following the close of evidence, Galdamez made an oral motion to amend the pretrial order to include a retaliation claim, which the district court denied. The district court also refused to give a requested jury instruction on the Postal Service's potential liability for failing to investigate and remedy harassment at the hands of customers and community members.

During deliberations, the jury sent a note to the judge seeking clarification of the special verdict form. In response, the district court gave the jury a modified special verdict form and additional instructions requiring the jury to decide whether discrimination occurred, and if so, to specify which of Galdamez's three primary supervisors—Bogroff, Jackson, and John Fusco, who substituted for Bogroff during part of 1996—had intentionally discriminated against her. The jury returned a verdict for the Postal Service, finding that Galdamez had not "established by a preponderance of the evidence that her national origin was a motivating factor in any adverse employment action on the part of her supervisors that affected the terms and conditions of her employment." Finding no discrimination, the jury did not reach the specific questions as to each supervisor's role. The jurors also submitted a handwritten note with their verdict stating their unanimous conviction that the Postal Service had subjected Galdamez to some "adverse employment action." The district court denied Galdamez's motion for a new trial, and this timely appeal followed.

II

Standard of Review

We review the district court's denial of Galdamez's new trial motion for abuse of discretion. *Ostad v. Or. Health Scis. Univ.*, 327 F.3d 876, 883 (9th Cir. 2003). Standards for reviewing the district court's particular decisions are discussed more fully in each section below.

## III

## Analysis

### A.   Motion to Amend the Pretrial Order

Following the close of evidence, Galdamez moved to amend the pretrial order to include a retaliation claim. According to Galdamez, evidence emerged at trial that the Postal Service had subjected her to various retaliatory actions after Ron Gates, Galdamez's second official representative in disciplinary proceedings, told Bogroff that an EEO investigation might result from the attempt to discipline Galdamez. The district court, noting that the disciplinary process started well before Gates made the comment, and thus could not have been instituted in retaliation for it, denied the motion for lack of evidence to support the claim.

**[1]** Galdamez had the burden of showing that an amendment to the pretrial order was necessary to prevent "manifest injustice." *See* Fed. R. Civ. P. 16(e); *Byrd v. Guess*, 137 F.3d 1126, 1132 (9th Cir. 1998). In evaluating a motion to amend the pretrial order, a district court should consider four factors: (1) the degree of prejudice or surprise to the defendants if the order is modified; (2) the ability of the defendants to cure the prejudice; (3) any impact of modification on the orderly and efficient conduct of the trial; and (4) any willfulness or bad faith by the party seeking modification. *Id.* We review the district court's denial of the motion for abuse of discretion. *Id.* at 1131.

**[2]** Even if the evidence was sufficient to support a retaliation claim, the district court did not abuse its discretion in denying the motion. Galdamez had all of the essential evidence she identified in support of the claim well before entry of the pretrial order. However, she did not file her motion until after the close of evidence, and thereby deprived the Postal Service of any opportunity to present additional evi-

dence or examine witnesses on this issue. Had the district court granted the motion, the Postal Service would have been able to respond to the retaliation claim only in closing argument. The Postal Service thus may have been prejudiced by the modification and would not have been able to cure that prejudice effectively. *See Byrd*, 137 F.3d at 1131-32.

[3] We conclude that Galdamez has not shown the requisite manifest injustice.

## B.    Mixed Motive Instruction

Galdamez contends that the district court failed to give a mixed motive instruction despite sufficient evidence.[4] The district court's formulation of jury instructions is reviewed for abuse of discretion, as is the sufficiency of the evidence to support a mixed motive instruction. *See Costa v. Desert Pal-*

---

[4]Galdamez requested a mixed motive instruction based on *Costa v. Desert Palace, Inc.*, 299 F.3d 838 (9th Cir. 2002) (en banc), *aff'd*, 539 U.S. 90 (2003). In pertinent part, her requested instruction read:

> If you find that the plaintiff's national origin and/or color was a motivating factor in the defendant's treatment of the plaintiff, the plaintiff is entitled to your verdict, even if you find that the defendant's conduct was also motivated by a lawful reason. . . . The plaintiff is entitled to damages unless the defendant proves by a preponderance of the evidence that the defendant would have treated plaintiff similarly even if the plaintiff's national origin and/or color had play [*sic*] no role in the employment decision.

The district court instead instructed the jury that Galdamez had to establish two elements by a preponderance of the evidence:

> 1) That [Galdamez's] supervisors at the United States Postal Service subjected [Galdamez] to adverse employment action that affected the terms and conditions of [her] employment while she was the Postmaster in Willamina, and

> 2) That [Galdamez's] national origin was a motivating factor in the supervisors' decision to subject [her] to that adverse employment action.

*ace, Inc.*, 299 F.3d 838, 858 (9th Cir. 2002) (en banc), *aff'd*, 539 U.S. 90 (2003). Whether an instruction misstates the law, however, is a legal issue reviewed *de novo*. *Id.*

**[4]** The evidence in the record was sufficient to support a mixed motive instruction. *See Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1072 (9th Cir. 2004) (as amended); *Costa*, 299 F.3d at 858-59. The instruction given *was* a mixed motive instruction: It asked the jury whether Galdamez's national origin was "*a* motivating factor," not *the* motivating factor, in the Postal Service's decision. *See* 42 U.S.C. § 2000e-2(m) (emphasis added). The district court declined to instruct the jury on the affirmative defense that the Postal Service would have taken the same action in the absence of an impermissible motivating factor, *see* 42 U.S.C. § 2000e-5(g)(2)(B), because the Postal Service never raised it. This was neither an abuse of discretion, nor a misstatement of the law, because it preserved the portion of the mixed motive instruction required by the evidence, and because omission of the affirmative defense, if anything, favored Galdamez.

**[5]** In any event, any instructional error here was more likely than not harmless. *See Swinton v. Potomac Corp.*, 270 F.3d 794, 805-06 (9th Cir. 2001) (explaining civil harmless error standard). The jury was instructed that it could find for Galdamez if her national origin was "a motivating factor" for her adverse treatment. When presented with a note from jurors during deliberations, expressing some confusion as to whether discriminatory animus had to be "the" motivating factor as opposed to "a" motivating factor, the district court clarified that "[a] 'motivating factor' means that it has to be at least one of the reasons for any adverse employment action." Finally, when asked in the special verdict form whether Galdamez had proven that her national origin was "a motivating factor in any adverse employment action on the part of her supervisors," the jury answered "No," but took pains to include a separate note stating its unanimous conclusion that Galdamez's supervisors "subjected Ms. [Galdamez]

to adverse employment action." There was thus a clear finding that discriminatory animus was not "*a motivating factor*" in the Postal Service's decision. In other words, the jury received a fair approximation of a mixed motive instruction as it pertained most clearly to Galdamez's disparate treatment claim, but resolved the facts against her. Therefore, any error stemming from the district court's truncated version of the mixed motive instruction was more likely than not harmless.

## C. Employer Liability for Customer Harassment

**[6]** Galdamez claims that the district court erroneously refused to instruct the jury on the Postal Service's duty to investigate and remedy actionable harassment by customers and community members. "A party is entitled to an instruction about his or her theory of the case if it is supported by law and has foundation in the evidence." *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002). The district court variously cited three rationales for its decision: 1) that Title VII does not provide a "stand-alone" claim for failure to investigate and remedy racial or national origin harassment by third parties unless that failure itself is motivated by discriminatory animus; 2) that Galdamez, as a management-level employee, was responsible for remedying any such harassment herself; and 3) that the evidence did not support the requested instruction. We view the first two rationales as conclusions going to the legal requirements of the claim, and thus review them *de novo*, *Fireman's Fund Insurance Companies v. Alaskan Pride Partnership*, 106 F.3d 1465, 1469 (9th Cir. 1997), while we review the third, evidentiary conclusion for abuse of discretion. *See Jones*, 297 F.3d at 934.

**[7]** The district court erred as a matter of both law and fact in refusing the instruction. An employer may be held liable for the actionable third-party harassment of its employees where it ratifies or condones the conduct by failing to investigate and remedy it after learning of it. *See, e.g.*, *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 968 (9th Cir. 2002)

(holding employer liable where, by "failing to take immediate and effective corrective action," it "ratified" rape of employee by potential client); *Folkerson v. Circus Circus Enters., Inc.*, 107 F.3d 754, 756 (9th Cir. 1997) ("We now hold that an employer may be held liable for sexual harassment on the part of a private individual . . . where the employer either ratifies or acquiesces in the harassment by not taking immediate and/ or corrective actions when it knew or should have known of the conduct.").[5] This hostile environment theory of employer liability is grounded in negligence and ratification rather than intentional discrimination. *See Swenson v. Potter*, 271 F.3d 1184, 1191-92 (9th Cir. 2001) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 759 (1998)). Therefore, the district court applied incorrect law in refusing the instruction based on its belief that Galdamez had to prove that discriminatory animus motivated the Postal Service's failure to act.

**[8]** The district court also erred in concluding that Galdamez's position as postmaster relieved the Postal Service of responsibility to investigate and prevent harassment. Title VII prohibits racial and national origin discrimination by an employer "against any *individual* with respect to [her] compensation, terms, conditions, or privileges of employment," 42 U.S.C. § 2000e-2(a)(1) (emphasis added), and makes no relevant distinctions between managerial and other employees. *See* 42 U.S.C. § 2000e(f) (defining "employee" as "an individual employed by an employer," subject to certain exceptions inapplicable here); *see also Little*, 301 F.3d at 964 (holding employer liable for failing to address rape of management-level employee). Galdamez is as entitled as any other employee to the protections of Title VII. The district court erred to the extent that it concluded otherwise.

---

[5]Although these cases involved hostile work environments created by third-party sexual harassment, the same analysis applies to instances of racial or national origin harassment. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 n.10 (2002); *see also* 29 C.F.R. § 1606.8(e).

Finally, the evidence was sufficient to support jury instructions on both a hostile work environment and employer liability. To make out a hostile work environment claim, Galdamez must show (1) that she was subjected to verbal or physical conduct based on her race or national origin; (2) that the conduct was unwelcome; and (3) that the conduct was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive work environment." *Vasquez v. County of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003). In order to satisfy the third element of this test, she must show that her work environment was both subjectively and objectively hostile. *See McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1113 (9th Cir. 2004). In making the objective determination, we look to all of the circumstances, including the frequency, severity, and nature (*i.e.*, physically threatening or humiliating as opposed to merely verbally offensive) of the conduct. *See Vasquez*, 349 F.3d at 642. The required severity of the conduct varies inversely with its pervasiveness and frequency. *McGinest*, 360 F.3d at 1113. Finally, the objective hostility of the environment must be considered "from the perspective of a reasonable person belonging to the racial or ethnic group of the plaintiff." *Id.* at 1115.

**[9]** Properly instructed as to these requirements, a reasonable jury could have found that Galdamez experienced a hostile work environment based on her national origin. Galdamez began to receive hostile comments from customers and other residents based on her race, accent, and national origin almost immediately upon taking the job in Willamina. Several customers, including the mayor, expressed displeasure with having a Hispanic postmaster or criticized her accented English. One local newspaper referred to Galdamez's "thick accent from her native Honduras" in explaining that she had not "made friends in some quarters" and was the object of an ouster campaign. Supervisor John Fusco made notes of a conversation with the mayor in which he referred to "culture" and "prejudice," but could not recall why at the time of trial.

**[10]** A reasonable jury also could have found that the community's treatment of Galdamez was both subjectively and objectively severe or pervasive. Galdamez received threats to her life and safety, including an anonymous letter promising to "get rid of you foreigner." A customer warned Galdamez that Willamina was a "redneck town," and that "[e]veryone" would get together and "come and kill [her]" if she persisted in trying to enforce postal regulations. Galdamez's subordinates also recalled hearing of at least two other similar threats, and one postal worker gave Galdamez a list of townspeople who would "not think twice" about "get[ting] together and kill[ing]" her. Greenhill, one of the primary organizers of the mass meeting, told a local newspaper that he did not want Galdamez to be present because he "didn't want her tarred and feathered on the spot [and] didn't want this to turn into a public lynching." Finally, Galdamez's car was vandalized in the post office lot, an act that Ron Gates thought may have been racially motivated. Other Postal Service employees confirmed at trial that they thought Galdamez's difficulties stemmed from community prejudice.

**[11]** These comments and acts took place over the course of three years, and included not only offensive remarks, but also racially charged references to potential mob violence, indirect threats to physical safety, and property damage. In context, it is somewhat difficult to disentangle the acts explicitly based on Galdamez's national origin from those that may have had some other motivation.**⁶** Nonetheless, considering all

---

**⁶**We recently followed the Third Circuit in concluding that there are no "talismanic expressions" of racial animus necessary to sustain a harassment claim, and recognized that racially charged "code words" may provide evidence of discriminatory intent by "send[ing] a clear message and carry[ing] the distinct tone of racial motivations and implications." *McGinest*, 360 F.3d at 1117 (quoting *Aman v. Cort Furniture Rental Group*, 85 F.3d 1074, 1083 (3d Cir. 1996)). The word "redneck," a term that appears several times in the record of this case, can suggest racial hostility. *See, e.g.*, *Jackson v. Quanex Corp.*, 191 F.3d 647, 666 (6th Cir. 1999) ("The evidence demonstrates that Quanex management adopted the

of the circumstances, a jury reasonably could have found that Galdamez was subjected to unwelcome, severe, and pervasive national origin harassment that affected the terms and conditions of her employment, *see Vasquez*, 349 F.3d at 642, and that the environment was both subjectively and objectively abusive when considered from the perspective of a reasonable person of her race and national origin. *Cf. McGinest*, 360 F.3d at 1115-19 (reversing summary judgment against plaintiff subjected to numerous offensive racial comments and one potentially injurious situation over the course of several years). The evidence thus supported a hostile work environment instruction.

**[12]** The evidence also supported an instruction on the Postal Service's potential liability for failing to investigate and remedy the harassment. Once the Postal Service actually knew (or reasonably should have known) about what Galdamez was experiencing, it was required to "undertak[e] remedial measures 'reasonably calculated to end the harassment.' " *McGinest*, 360 F.3d at 1120 (quoting *Ellison v. Brady*, 924 F.2d 872, 882 (9th Cir. 1991)). The "reasonable-

---

attitude that everyone knew the plant was a 'redneck' environment, and that therefore, racially offensive conduct taking place there was not harassment, but conduct African-American employees had to accept as part of life at Quanex."); *United States v. Pasadena Indep. Sch. Dist.*, No. H-83-5107, 1987 WL 9919, at *18 (S.D. Tex. Apr. 18, 1987) (finding that city's reputation as "a white 'redneck' or racist community" had discouraged minority applicants from seeking jobs in school district); *but see Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 257-58 (3d Cir. 2002) (noting that in certain contexts "redneck" may "imply . . . racial intolerance and bigotry," but concluding that a t-shirt bearing the word was unrelated to the specific racial harassment at issue). The repeated references in the record here to Willamina being a "redneck" town, in combination with Greenhill's public statements evoking a potential lynching, convey an atmosphere of racial hostility, and thus could support a reasonable inference that some community members' actions were based on Galdamez's race or national origin, notwithstanding the absence in some instances of "talismanic" language to that effect.

ness" of such remedial measures would depend on the Postal Service's ability to stop the harassment and to deter potential harassers, as well as the promptness of the response. *Id.*

**[13]** Galdamez testified that she informed her superiors almost immediately after taking office in 1994 of customer harassment based on her accent and national origin.[7] When Galdamez first complained of the harassment, Bogroff told her Willamina was a "redneck town" and that she was "tough" enough to deal with the treatment. Jackson testified that postmasters were expected to "grin and bear" racist remarks and harassment, at least up to the point where law enforcement involvement became necessary. These same supervisors also testified that they did not know whether they had any specific obligation to look into racial harassment, or special procedures for confronting it, as they did in the context of sexual harassment. This evidence suggests that the Postal Service's response to Galdamez's difficulties was limited at best.

**[14]** On the other hand, there was some evidence that Galdamez's superiors did respond, specifically by offering Galdamez a position in a town with a larger Hispanic community and by arranging for a diversity specialist to inquire into the situation. They did so, however, only in conjunction with imposing formal discipline against Galdamez. Weighing all the evidence, a reasonable jury could have found that the harassment was actionable, that management-level Postal Service employees knew or should have known about it while it was happening, and that they nonetheless failed to take steps reasonably calculated to end and deter it, at least to the extent

---

[7]Other testimony suggested that management-level Postal Service personnel first became aware of the harassment in 1997. An employer's liability runs only from the time it knew or should have known of the conduct. *Swenson v. Potter*, 271 F.3d 1184, 1192 (9th Cir. 2001). Given the conflicting testimony in the record, this should be a factual question for the jury.

such steps were within their power. *See McGinest*, 360 F.3d at 1120; *Ellison v. Brady*, 924 F.2d 872, 882 (9th Cir. 1991). The conflicting testimony as to the timing and extent of the Service's response clearly presents issues of fact that could be resolved either way. In this light, it was an abuse of discretion to deny Galdamez an instruction on this theory of her case.

**[15]** These errors were not harmless. In this circuit we presume prejudice where civil trial error is concerned, and the burden shifts to the Postal Service to demonstrate "that it is more probable than not that the jury would have reached the same verdict" had it been properly instructed. *Obrey v. Johnson*, 400 F.3d 691, 701 (9th Cir. 2005). The jury was instructed to determine only whether Galdamez's superiors acted with discriminatory intent in disciplining her. The jurors never were told that the Postal Service also could be liable for actionable harassment by third parties if it failed to take reasonable steps within its power to address the problem. Moreover, the jury might have felt that there was some discriminatory aspect of the case it could not reach, as evidenced by its handwritten addendum to the special verdict form emphasizing that the Postal Service had subjected Galdamez to some adverse employment action. Properly instructed, the jury may well have held the Postal Service liable. Accordingly, we reverse and remand for a new trial on this claim.[8]

---

[8]We do not suggest that a new trial be held on all issues raised in the previous trial, but only on the harassment claim and the theory of employer liability that did not go to the jury. In appropriate situations, we may confine a new trial to particular issues. *See, e.g.*, *Ward v. City of San Jose*, 967 F.2d 280, 284-85 (9th Cir. 1992); *see also* 11 Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice & Procedure § 2814, at 158 (2d ed. 1995). Here the issues relating to whether Galdamez was subjected to customer harassment and whether her employer is liable for failing to investigate her allegations are "so distinct and separable from others that a trial of [those] alone may be had without injustice." *Gasoline Prods. Co., Inc. v. Champlin Refining Co.*, 283 U.S. 494, 500 (1931).

D.   The Verdict Form's Emphasis on Named Supervisors

**[16]** Galdamez raised several objections to the special verdict form, which required jurors to specify which of three named supervisors intentionally discriminated against her. "As long as the questions are adequate to obtain a jury determination of all the factual issues essential to judgment, the trial court has complete discretion as to the form of the special verdict." *Saman v. Robbins*, 173 F.3d 1150, 1155 (9th Cir. 1999).

**[17]** Question 1 on the special verdict form provided:

> Has Plaintiff Arlene Graves (Galdamez) established by a preponderance of the evidence that her national origin was a motivating factor in any adverse employment action on the part of her supervisors that affected the terms and conditions of her employment while she was the postmaster in Willamina?

> Yes_____          No__X__

It was only if the answer to that question was "Yes" that the jury was to specify in Question 2 whether particular supervisors had intentionally discriminated against her. Thus, the jury having found that her national origin was not a motivating factor in any adverse employment action, any deficiency in the form of Question 2 was irrelevant here.[9]

---

[9] We emphasize that our holding is confined to these narrow facts. Although this is not the case here, it is conceivable that a question asking jurors to identify discrimination on the part of individual *supervisors* could inadvertently limit or otherwise influence the jury's consideration of other questions, including that of liability on the part of the *employer*. Moreover, had Galdamez's harassment claim also gone to the jury, the special verdict form would have been improper with respect to that claim, because it would have precluded a finding in her favor on the Postal Service's liability for third-party harassment. Finally, such a special verdict form would have been inappropriate had this case involved an allegation that one indi-

E.   Changes to the Special Verdict Form After Closing
Argument

**[18]** Galdamez contends that the district court erred by
changing the verdict form during deliberations, thereby
depriving her of the opportunity to address the verdict form
in closing arguments. The district court may have abused its
discretion by changing the verdict form after submitting the
case to the jury. *See Ruvalcaba v. City of Los Angeles*, 167
F.3d 514, 521-23 (9th Cir. 1999); *see also Landes Const. Co.,
Inc. v. Royal Bank of Can.*, 833 F.2d 1365, 1374 (9th Cir.
1987). Any such error, however, was harmless. Galdamez
does not explain how her closing argument would have been
different had the substance of the revised form been disclosed
in time for her to make adjustments. The only logical adjust-
ment she could have made would have been to direct her
arguments to the actions of the three supervisors named in the
special verdict form. In fact, she devoted the bulk of her clos-
ing argument to the actions of two of these supervisors, sug-
gesting that the argument she actually made was basically the

vidual's discriminatory animus infected a more complex decision-making
process. Title VII may still be violated where the ultimate decision-maker,
lacking individual discriminatory intent, takes an adverse employment
action in reliance on factors affected by another decision-maker's discrim-
inatory animus. *See, e.g.*, *Price Waterhouse v. Hopkins*, 490 U.S. 228,
232-35 (1989) (describing process by which the employer's "Policy
Board," informed by various comments from partners, some of which
demonstrated an illegal bias based on sex, took an adverse employment
action); *Shager v. Upjohn Co.,* 913 F.2d 398, 405 (7th Cir. 1990) (holding
that company decisionmaker that acts as "the conduit of [a lower-level
supervisor's] prejudice — his cat's paw" — is liable under Title VII).

These are but three examples of cases in which the district court proba-
bly would have abused its discretion by focusing the jury on named indi-
viduals. Given the various ways employers structure their personnel
decisions, a special verdict form such as the one used here is unlikely to
be illuminating, and in many cases may mislead or confuse the jury or oth-
erwise lead to error. As a general matter, therefore, we discourage the use
of such special verdicts in these cases.

same argument she would have made had the district court disclosed the substance of the special verdict in a more timely fashion. *See Ruvalcaba*, 167 F.3d at 522-23. Therefore, we must conclude that any error in the timing of disclosure was harmless.

## IV

## Conclusion

For the foregoing reasons, the district court's denial of Galdamez's motion for a new trial is AFFIRMED in part, REVERSED in part, and REMANDED for a new trial on her hostile work environment claim and the Postal Service's potential liability.

Each party shall bear their own costs on appeal.